UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

CITY SELECT AUTO SALES, INC.,
a New Jersey corporation,
individually and as the                    Civil No. 13-4595 (NLH/JS)
representative of a class
of similarly situated persons,

                 Plaintiff,            **OPINION**

v.

BMW BANK OF NORTH AMERICA
INC., et al.,

                 Defendants.
_____

**APPEARANCES:**

Alan C. Milstein, Esq.
Sherman, Silverstein, Kohl, Rose & Podolsky, PC
Eastgate Corporate Center
308 Harper Drive
Suite 200
Moorestown, New Jersey 08057

       *Counsel for Plaintiff*

Ryan I. DiClemente, Esq.
Saul Ewing LLP
750 College Road East
Suite 100
Princeton, New Jersey 08540

       *Counsel for Defendants BMW Bank of North America, Inc.*
       *and BMW Financial Services NA, LLC*

Robert A. Smith, Esq.
Thomas J. Gaynor, Esq.
Smith & Doran, P.C.
60 Washington Street
Morristown, New Jersey 07960

       *Counsel for Defendant Creditsmarts Corp.*

1

**HILLMAN, District Judge:**

In this putative class action for claims concerning an alleged "junk fax," presently before the Court are Plaintiff's motion for class certification and a motion by Defendants BMW Bank of North America, Inc. and BMW Financial Services NA, LLC (hereafter, "BMW Defendants") for summary judgment.  Associated with these motions are two motions by Plaintiff for leave to cite supplemental authority, and a motion by Plaintiff to strike a submission filed by Defendant Creditsmarts Corp. (hereafter, "Creditsmarts") joining in the BMW Defendants' summary judgment motion.[1]

The Court has considered the submissions of the parties and decides this matter pursuant to Fed. R. Civ. P. 78.  For the reasons that follow, Plaintiff's motion for class certification will be denied, Plaintiff's motions for leave to cite supplemental authority will be granted, the BMW Defendants' summary judgment motion will be denied, and Plaintiff's motion to strike Creditsmarts' submission will be granted.

I.   **BACKGROUND**

On December 27, 2012, Plaintiff, City Select Auto Sales, Inc., received an unsolicited telephone facsimile on its fax

---

[1] Creditsmarts does not seek summary judgment on its behalf, but only to present further evidence in support of the BMW Defendants' motion.

2

machine.  Plaintiff alleges that the fax was an advertisement for the goods, products or services of the BMW Defendants and Creditsmarts.  Based on this fax, Plaintiff filed a two-count complaint alleging a violation of the Telephone Consumer Protection Act (hereafter, "TCPA"), 47 U.S.C. § 227, and common law conversion.  Plaintiff and the BMW Defendants thereafter stipulated to dismissal of the conversion count, but such count remains pending as to Creditsmarts.

Defendant BMW Bank of North America, Inc. (hereafter, "BMW Bank") offers direct automotive financing through "up2drive," a division of BMW Bank that provides direct loans to consumers. Up2drive is an auto lending division of BMW Bank, but Defendant BMW Financial Services NA, LLC (hereafter, "BMW FS") is the service provider for up2drive.

Creditsmarts is an internet-based "indirect business-to-business lending tree model."  According to Creditsmarts' website,[2] an independent automobile dealer inputs customer information into a Creditsmarts database, and the information is forwarded to various lenders who have agreed to receive applications through Creditsmarts.  Those lenders then approve loans for the customers, which approval is forwarded back to the automobile dealers.  Through this model, lenders have access to

---

[2] www.creditsmarts.com/products.asp

more applicants, and dealers are able to sell more cars when their customers can more quickly and readily obtain automobile loans.

BMW FS entered into two agreements with Creditsmarts: a Master Professional Services Agreement (hereafter, "MPSA"), and an up2drive/Vendor Marketing Agreement (hereafter, "Marketing Agreement"). Pursuant to the terms of the MPSA, Creditsmarts was to provide "either professional consulting services and/or employment agency services," which services were to be described in separate "Statement of Work" agreements that would be incorporated into the MPSA.

The Marketing Agreement is governed by the MPSA and incorporates the terms and conditions of the MPSA. The Marketing Agreement states that up2drive "desires to provide conditional approvals to qualified customers, to offer loans or other various consumer loan products to approved customers," and to perform other duties defined in the contract. In addition, the Marketing Agreement states that Creditsmarts "offers potential borrowers the opportunity to complete a simple application form" so that credit information may be provided to lenders, and "desires to match qualified customers with the appropriate lender by evaluating whose credit profile passes the minimum credit parameters established by up2drive[.]"

4

The Marketing Agreement defined Creditsmarts'
responsibilities as follows:

1) [Creditsmarts] will establish electronic systems to
   permit customers to communicate with up2drive
   through mutually agreed secure lines of
   communication.

2) [Creditsmarts] will process all application forms
   using the minimum credit parameters established by
   up2drive and the information obtained . . . from the
   application form including the customer's credit
   history, that will provide sufficient data to
   determine whether the customer may qualify for any
   loan programs offered from by [sic] up2drive.

Notwithstanding the terms of the Marketing Agreement, Pawan
Murthy, the general manager of online business for BMW FS, who
signed the Marketing Agreement, testified that Creditsmarts was
primarily hired to conduct advertising for up2drive.  He
described the relationship with Creditsmarts as a "marketing
partnership" which "allows [up2drive's] services to be presented
to the customers that CreditSmarts" has.  According to Murthy,
pursuant to the Marketing Agreement, Creditsmarts was to
"promote up2drive services on behalf of" the BMW Defendants.

On three occasions in late 2012, Creditsmarts -- through a
fax broadcaster named Westfax, Inc. (hereafter, "Westfax") --
broadcast a fax that contained the up2drive logo and identified
BMW Bank of North America (hereafter, the "BMW fax").  Invoices
from Westfax to Creditsmarts indicate that 5,480 BMW faxes were
sent on November 29, 2012, 5,107 BMW faxes were sent on December

3, 2012, and 10,402 BMW faxes were sent on December 27, 2012. Plaintiff was the recipient of the December 27, 2012 fax.  The BMW Defendants and Creditsmarts contend that the BMW Defendants neither requested the creation of the fax nor authorized transmission of the fax at issue in this case.[3]

To send a fax through Westfax, Creditsmarts would upload the image to be faxed as well as a list of fax numbers.  The fax numbers were culled from Creditsmarts' customer database, which included various fields including customers' contact information, a "creation date" establishing when the business was added to the database, a field showing when the customer record was last updated, and a fax number if one had been provided by the customer.

The list of fax numbers that was provided to Westfax by Creditsmarts in connection with the BMW fax was never preserved. Westfax routinely discards its copies of such lists and no longer has access to the list of fax numbers provided by Creditsmarts.  Creditsmarts has a policy of maintaining the list

_____

[3] According to Defendants, Creditsmarts was required under the MPSA to obtain prior written approval from the BMW Defendants before using either of the BMW Defendants' names, trademarks or service marks "in any advertisement or publication."  Because the BMW fax contained the up2drive logo and the name of BMW Bank, Defendants contend that Creditsmarts required the BMW Defendants' approval before sending the fax.

of fax numbers as a temporary file until such list is uploaded
to the Westfax portal, at which time the list is deleted.

Although there is no record of the customers to whom the
BMW fax was sent, Plaintiff asserts that such list can be re-
created from Creditsmarts' database because the database
includes the potential universe of fax recipients.  The
database, however, was not preserved as of December 2012 and is
routinely updated.  Nonetheless, Creditsmarts' database was
preserved as of February 2014, and Plaintiff represents that
recipients of the BMW fax can be identified from the 2014
version of the database by ascertaining those customers who were
added to the database before December 2012 and who had fax
numbers listed in the database.[4]

---

[4] Plaintiff does not currently have the February 2014 version of
the database.  This document was subject to a motion to compel
discovery which was denied by Magistrate Judge Schneider in an
oral opinion and confirmed by text order dated February 20,
2015.  Plaintiff has produced an example of the information
contained in the database, and the absence of the database in
the record does not affect the Court's decision on class
certification.  As noted by the Third Circuit, a plaintiff does
not have to identify all class members at class certification;
"instead, a plaintiff need only show that 'class members can be
identified.'"  Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir.
2015) (internal citation omitted).  If, hypothetically,
recipients of the BMW fax could be ascertained from the
Creditsmarts database, the Court would not require the database
at this time as we need not identify each fax recipient for
purposes of class certification.

## II.   <u>JURISDICTION</u>

The Court has jurisdiction over Plaintiff's federal claim under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claim under 28 U.S.C. § 1367.

## III.  <u>STANDARD FOR CLASS CERTIFICATION</u>

### A.   Rule 23

In order to qualify for class certification under Federal Rule of Civil Procedure 23, a plaintiff must satisfy the four elements set forth in Rule 23(a), as well as the requirements of one of the three subsections in Rule 23(b).  <u>Wal-Mart Stores, Inc. v. Dukes</u>, , --- U.S. ---, 131 S. Ct. 2541, 2548-49, 180 L. Ed. 2d 374 (2011).  Rule 23(a) contains the prerequisites for a class, providing that class certification is proper if:

> (1)  the class is so numerous that joinder of all members is impracticable;
>
> (2)  there are questions of law or fact common to the class;
>
> (3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)  the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  "[Class] certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'"  <u>Hayes v.</u>

<u>Wal-Mart Stores, Inc.</u>, 725 F.3d 349, 353-54 (3d Cir. 2013) (quoting <u>Dukes</u>, 131 S. Ct. at 2551).

Once a plaintiff satisfies all four prerequisites under Rule 23(a), Rule 23(b) then identifies the types of class actions that can be brought.  Plaintiffs in this case seek certification pursuant to Rule 23(b)(3), which provides that a class may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The matters pertinent to these findings include:

> (A)  the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)  the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)  the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

The party moving for class certification bears the burden of demonstrating that the requirements of Rule 23 are met by a preponderance of the evidence.  <u>Hayes</u>, 725 F.3d at 354; <u>see also</u> <u>Comcast Corp. v. Behrend</u>, --- U.S. ---, 133 S. Ct. 1426, 1432,

185 L. Ed. 2d 515 (2013)("The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'  To come within the exception, a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23.")(internal citations omitted).  "A party's assurance to the court that it intends or plans to meet the requirements is insufficient."  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 318 (3d Cir. 2008).  "'Class certification is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met.'"  Carrera v. Bayer Corp., 727 F.3d 300, 306 (3d Cir. 2013) (quoting Hydrogen Peroxide, 552 F.3d at 309).

**B.   Ascertainability of the Class**

Before turning to the express requirements of Rule 23, courts must address the ascertainability of a class as a "preliminary" or "implied" requirement of class certification when a class action is brought under Rule 23(b)(3).  Byrd v. Aaron's Inc., 784 F.3d 154, 162 n.5 (3d Cir. 2015); Carrera, 727 F.3d at 305 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 591 (3d Cir. 2012)).  "Many courts and commentators have recognized that an essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on

objective criteria." Marcus, 687 F.3d at 592-93 (citations omitted). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." Id. at 593.

The Third Circuit, in Carrera, explained that the ascertainability requirement serves several important objectives. "First, at the commencement of a class action, ascertainability and a clear class definition allow potential class members to identify themselves for purposes of opting out of a class." Carrera, 727 F.3d at 307. "Second, it ensures that a defendant's rights are protected by the class action mechanism." Id. "Third, it ensures that the parties can identify class members in a manner consistent with the efficiencies of a class action." Id. "If a class cannot be ascertained in an economical and 'administratively feasible' manner, significant benefits of a class action are lost." Id. (citing Marcus, 687 F.3d at 593-94).

In recent years the Third Circuit has emphasized the importance of ascertainability with respect to classes certified under Rule 23(b)(3). In Marcus, the claim was that Bridgestone "run-flat tires" were defective because they were highly susceptible to flats, could not be repaired but only replaced, and were expensive. Marcus, 687 F.3d at 588. The district court certified a class of current and former owners and lessees

11

of BMW vehicles equipped with the run-flat tires whose tires had gone flat and been replaced.  Id. at 590.  On appeal, the Third Circuit noted BMW's arguments that it did not have records of which cars were fitted with run-flat tires, that some customers may have changed tires without BMW's knowledge, and that BMW would not have known which customers experienced flat tires. Id. at 593-94.  The Third Circuit rejected the idea that having vehicle owners "submit affidavits that their [run-flat tires] have gone flat and been replaced" would be sufficient for ascertaining class membership because it would be based only on "potential class members' say so."  Id. at 594.  "Forcing BMW and Bridgestone to accept as true absent persons' declarations that they are members of the class, without further indicia of reliability, would have serious due process implications."  Id.

In Carrera, the Third Circuit, relying on Marcus, vacated the certification of a class defined as all consumers who bought WeightSmart, a dietary supplement, in Florida.  727 F.3d at 304. The plaintiff had alleged on behalf of a putative class that the defendant, Bayer, falsely claimed the supplement enhanced metabolism, but the plaintiff could not satisfy the ascertainability standard because class members were unlikely to have documentary proof of purchase, such as packaging or receipts, and Bayer had no list of purchasers because it did not sell directly to consumers.  Id.  The plaintiff suggested that

12

class members could submit affidavits attesting to their
purchase of the supplement, and also proposed a mechanism for
screening the affidavits to identify potentially fraudulent
claims, but the Third Circuit concluded that the plaintiff had
not demonstrated ascertainability.  Id. at 308, 311.

In so finding, the Third Circuit stated that the "method of
determining whether someone is in the class must be
'administratively feasible.'"  727 F.3d at 307.
"'Administrative feasibility means that identifying class
members is a manageable process that does not require much, if
any, individual factual inquiry.'"  Id. at 307-08 (internal
citation omitted).  The Third Circuit further stated that "to
satisfy ascertainability as it relates to proof of class
membership, the plaintiff must demonstrate his purported method
for ascertaining class members is reliable and administratively
feasible, and permits a defendant to challenge the evidence used
to prove class membership."  727 F.3d at 308.

In Hayes, the Third Circuit again vacated the certification
of a class of consumers.  In Hayes, Sam's Club offered extended
warranties for various items in the store, which warranties did
not cover "as-is" items unless such items still had their
manufacturer's original warranties, were "last one" items that
were sealed and brand-new, or were display items.  725 F.3d at

352.[5]  The district court certified a class of consumers who purchased extended warranties to cover "as-is" products, but excluded from the class those consumers whose "as-is" products were covered by the manufacturer's warranty or were "last one" items.  Id. at 353.

The Third Circuit found that the plaintiff failed to demonstrate the ascertainability of the class.  Even though the defendant failed to keep records of who purchased "as-is" items, which hindered the plaintiff's ability to bring a class action, the Third Circuit emphasized that the plaintiff nonetheless must demonstrate that the requirements of Rule 23 are met.  Id. at 356.  The Third Circuit stated that a plaintiff does not meet his burden of showing by a preponderance of the evidence that there is a reliable and administratively feasible method for ascertaining the class when "the only proof of class membership is the say-so of putative class members or if ascertaining the class requires extensive and individualized fact-finding."  Id.

In Byrd, the plaintiffs entered into a lease agreement to rent a laptop computer from the defendant, a franchisee of Aaron's, Inc., and subsequently learned that the defendant,

---

[5] Items could be designated "as-is" for a number of reasons, including (1) display items, which were removed from their packaging to show to members; (2) items which were purchased and then returned; (3) items that were "last one" products that Sam's Club wanted to clear out; or (4) items that were damaged in-Club.  Hayes, 725 F.3d at 325.

without the plaintiffs' knowledge, had installed spyware that collected screenshots, keystrokes, and webcam images from the computer and its users. <u>Byrd</u>, 784 F.3d at 159.  The plaintiffs brought a class action complaint alleging violations of and conspiracy to violate the Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2511, as well as common law invasion of privacy and aiding and abetting.  <u>Id.</u>  The plaintiffs sought to certify classes of persons who leased or purchased computers from Aaron's, Inc. or an Aaron's, Inc. franchisee, and their household members, on whose computers spyware was installed and activated without consent.  <u>Id.</u>

The Third Circuit in <u>Byrd</u> provided a thorough explanation of the ascertainability requirement.  Although the district court had concluded that the proposed classes were not ascertainable, the Third Circuit reversed for a number of reasons, including that the lower court misstated and applied the wrong law governing ascertainability by conflating class definition standards with the ascertainability requirement.  <u>Id.</u> at 165-66.  The Third Circuit in <u>Byrd</u> concluded that the proposed classes consisting of "owners" and "lessees" were ascertainable because there were "objective records" that could "readily identify" the class members, because Aaron's records revealed the computers upon which the spyware was activated and the identity of the customer who leased or purchased each

15

computer.  Id. at 169.  Furthermore, although the class definitions also included "household members" of the lessees and owners of laptop computers, the Third Circuit found that such household members were ascertainable because they could submit a form attesting to their status in the putative class, and the forms could then be reconciled against the already-known addresses of owners and lessees as well as additional public records.  Id. at 170.

## IV.   STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' . . . demonstrate the absence of a genuine issue of material fact" and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citing Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  "In considering a motion for summary judgment, a district court may

16

not make credibility determinations or engage in any weighing of
the evidence; instead, the non-moving party's evidence 'is to be
believed and all justifiable inferences are to be drawn in his
favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d
Cir. 2004)(citing Anderson, 477 U.S. at 255, 106 S. Ct. 2505).

Initially, the moving party bears the burden of
demonstrating the absence of a genuine issue of material fact.
Celotex, 477 U.S. at 323, 106 S. Ct. 2548 ("[A] party seeking
summary judgment always bears the initial responsibility of
informing the district court of the basis for its motion, and
identifying those portions of 'the pleadings, depositions,
answers to interrogatories, and admissions on file, together
with the affidavits, if any,' which it believes demonstrate the
absence of a genuine issue of material fact."); see also
Singletary v. Pa. Dept. of Corr., 266 F.3d 186, 192 n.2 (3d Cir.
2001) ("Although the initial burden is on the summary judgment
movant to show the absence of a genuine issue of material fact,
'the burden on the moving party may be discharged by 'showing' -
- that is, pointing out to the district court -- that there is
an absence of evidence to support the nonmoving party's case'
when the nonmoving party bears the ultimate burden of
proof.")(citing Celotex, 477 U.S. at 325, 106 S. Ct. 2548).

Once the moving party has met this burden, the nonmoving
party must identify, by affidavits or otherwise, specific facts

17

showing that there is a genuine issue for trial.  <u>Celotex</u>, 477
U.S. at 324, 106 S. Ct. 2548.  A "party opposing summary
judgment 'may not rest upon the mere allegations or denials of
the . . . pleading[s.]'"  <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228,
232 (3d Cir. 2001).  For "the non-moving party[ ] to prevail,
[that party] must 'make a showing sufficient to establish the
existence of [every] element essential to that party's case, and
on which that party will bear the burden of proof at trial.'"
<u>Cooper v. Sniezek</u>, 418 F. App'x 56, 58 (3d Cir. 2011) (citing
<u>Celotex</u>, 477 U.S. at 322, 106 S. Ct. 2548).  Thus, to withstand
a properly supported motion for summary judgment, the nonmoving
party must identify specific facts and affirmative evidence that
contradict those offered by the moving party.  <u>Anderson</u>, 477
U.S. at 257, 106 S. Ct. 2505.

**V.**   **<u>DISCUSSION</u>**

    **A.   Class Certification**

Plaintiff seeks certification of the following class:

> All auto dealerships that were included in the
> Creditsmarts database on or before December 27, 2012,
> with fax numbers identified in the database who were
> sent one or more telephone facsimile messages between
> November 20, 2012 and January 1, 2013, that advertised
> the commercial availability of property, goods or
> services offered by "BMW Bank of North America."

Because Plaintiff seeks to certify a class pursuant to Fed.
R. Civ. P. 23(b)(3), the Court first considers the
ascertainability of the class.  Indeed, ascertainability is the

main point upon which Defendants' opposition is based.  The
record is clear that the BMW Defendants, Creditsmarts, and
Westfax did not maintain a list of individuals or entities that
were contacted by fax.  The invoices from Westfax show only the
total number of faxes sent on various dates, but do not reflect
the individual fax numbers to which the faxes were sent.
Plaintiff contends, nevertheless, that the class is
ascertainable because if an auto dealership claims to have
received the fax, and that claimant is an auto dealership in
Creditsmarts' database, then class membership is based not on
only the dealership's "say so" but also on the corroborating
fact that the dealership is within the universe of database
entries from which the fax list was constructed.

    The Court finds that Plaintiff fails to demonstrate that
the class is ascertainable.  The Court notes that Plaintiff's
proposed method of ascertaining the class is not based only on
the "say so" of the prospective class members, in that the
Creditsmarts database may provide an additional layer of
verification.  However, after carefully considering the Third
Circuit case law, the Court cannot conclude that Plaintiff has
met its burden of demonstrating that the class is ascertainable.

    As discussed above, in Hayes, the Third Circuit considered
the ascertainability of a class of consumers who purchased from
Sam's Clubs in the State of New Jersey a Sam's Club Service Plan

19

to cover "as-is" products.  When a customer purchased an "as-is"
product, the cashier had to perform a manual price override.
Price overrides were also performed for other reasons, such as
matching a competitor's price or adjusting the price to a sale
price.  While Sam's Club had a record of all 3,500 purchases
with price overrides, which would have included all of the
customers who purchased "as-is" products, there was no way to
determine "how many of the 3,500 price-override transactions
that took place during the class period were for as-is items."
Hayes, 725 F.3d at 355.  Thus, although the potential universe
of customers was known to Walmart, the Third Circuit found that
the class was not ascertainable.

Similarly, in Marcus, the plaintiff sought to certify a
class of owners and lessees of BMW vehicles equipped with run-
flat tires whose tires had gone flat and been replaced.  While
there was a possibility that records could be produced to
identify the original owners and lessees of BMW vehicles
factory-equipped with run-flat tires which were initially
purchased or leased from New Jersey dealerships, there was no
way of knowing which cars left the lots with run-flat tires
because the tires could have been replaced by dealers in the
interim, and there was also no way of knowing which cars' tires
had gone flat and been replaced once they left the dealership.

In this case, similar to the facts of Hayes and Marcus, it appears there is documentary evidence of the potential universe of class members.  It is clear from the record that the list of recipients of the BMW fax was generated from the Creditsmarts database, and although the database was not preserved until February 2014, it appears that the parties can determine from the database those customers that were also on the list in December 2012.[6]  From this subset of customers, the parties can eliminate those customers who could not have been sent the fax because no fax number was contained in the database.  However, there is no evidence that the BMW fax was sent to every customer who had a fax number in the database during the relevant time period.  Plaintiff here has provided no method for determining which of the remaining customers would have been sent the BMW fax.  Much like Hayes and Marcus, even though Plaintiff may be able to identify the potential universe of fax recipients, there

---

[6] The Court recognizes that the database preserved as of 2014 is not identical to the database as of December 2012, and some auto dealerships who may claim they received the BMW fax may be erroneously excluded from the class because they were removed from the database at some point between December 2012 and February 2014.  As the Third Circuit noted in Byrd, however, a putative class need not "include all individuals who may have been harmed by a particular defendant[.]"  Byrd, 784 F.3d at 167.  "Individuals who are injured by a defendant but are excluded from a class are simply not bound by the outcome of that particular action."  Id.

is no objective way of determining which customers were actually sent the BMW fax.[7]

In so finding, the Court recognizes Plaintiff's argument that Defendants had the burden of establishing their compliance with the TCPA and that each person to whom a fax is sent gave prior permission.  In the authority upon which Plaintiff relies -- In re: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 -- the FCC notes that a sender of facsimiles has the obligation of demonstrating that it

---

[7] Plaintiff argues that the facts of this case are more akin to Byrd because claimants can be verified by cross-reference to objective records, i.e. the Creditsmarts database.  The Court disagrees.  In Byrd, the defendants' records revealed the computers upon which the spyware was activated, as well as the full identity of the customer who leased or purchased each of those computers.  Here, by contrast, the Creditsmarts database does not reveal those customers to whom the BMW fax was sent. If an auto dealership claims that it received the BMW fax, there is no way of verifying by reference to the database that the dealership was, in fact, sent the fax.  Plaintiff's reliance on Clark v. Bally's Park Place, Inc., 298 F.R.D. 188 (D.N.J. 2014), is similarly misplaced.  Clark involved a class of employees who were required to attend "Buzz Sessions" before their shifts but were not paid for their time attending such sessions.  Although the defendants did not maintain records of those employees who participated in the Buzz Sessions, the district court concluded that the class was ascertainable.  The defendants could identify those employees who worked a "Buzz Session eligible shift" through the use of employment records, and could assume that such employees actually attended the Buzz Sessions because attendance was mandatory.  Here, by contrast, there is no evidence that every customer in the Creditsmarts database who had a fax number was sent the BMW fax.  Consequently, unlike Clark, the Court cannot assume that everyone in the database as of December 2012 with a fax number would have actually been sent the BMW fax.

complied with the rules, including that it had the recipient's prior express invitation or permission, and "strongly suggest[s] that senders take steps to promptly document that they received such permission."  21 F.C.C.R. 3787, 3812 (Apr. 6, 2006).  The FCC does not, however, expressly require a sender of faxes to maintain written records of each recipient to whom a fax is sent.  Therefore, contrary to Plaintiff's assertion, Defendants did not have an obligation to preserve a "master list" of recipients of the BMW fax.

To be sure, when a defendant does not have an obligation to maintain records, its lack of records and business practices makes it more difficult for a plaintiff to ascertain the members of an otherwise objectively verifiable low-value class, which may cause class members to suffer.  See Carrera v. Bayer Corp., No. 12-2621, 2014 WL 3887938, at *3 (3d Cir. May 2, 2014) (Ambro, J., dissenting).  The Superior Court of New Jersey, Appellate Division has explained that "[a]llowing a defendant to escape responsibility for its alleged wrongdoing by dint of its particular recordkeeping policies . . . is not in harmony with the principles governing class actions."  Daniels v. Hollister Co., 440 N.J. Super. 359, 369, 113 A.3d 796 (N.J. Super. Ct. App. Div. 2015).  Several courts have criticized the Third Circuit as imposing too high of a burden on plaintiffs.  See, e.g., Rikos v. Procter & Gamble Co., --- F.3d ----, 2015 WL

23

4978712, at *22 (6th Cir. Aug. 20, 2015); <u>Mullins v. Direct</u>
<u>Digital LLC</u>, --- F.3d ----, 2015 WL 4546159, at *6 (7th Cir.
July 28, 2015);[8] <u>Langendorf v. Skinnygirl Cocktails, LLC</u>, 306
F.R.D. 574, 579 (N.D. Ill. 2014); <u>McCrary v. Elations Co., LLC</u>,
No. EDCV 13-00242, 2014 WL 1779243, at *8 (C.D. Cal. Jan. 13,
2014).  Nonetheless, the decisions in <u>Marcus</u>, <u>Hayes</u>, <u>Carrera</u>,
and <u>Byrd</u> are precedential opinions, and the standards set forth
therein must be followed by this Court.  These cases make clear
that a defendant's lack of records does not alleviate a
plaintiff's burden of demonstrating that a class can be
certified.  <u>See Hayes</u>, 725 F.3d at 356 ("the nature or
thoroughness of a defendant's recordkeeping does not alter the
plaintiff's burden to fulfill Rule 23's requirements.").

Having found that Plaintiff fails to demonstrate that the
class is ascertainable, which is a prerequisite to class
certification under Rule 23, the Court need not address the
remaining Rule 23 requirements.  Plaintiff's motion for class
certification will be denied.

---

[8] Plaintiff filed motions for leave to cite supplemental
authority as to the <u>Rikos</u> and <u>Mullins</u> cases.  The Court has
considered the Sixth Circuit's decision in <u>Rikos</u>, as well as the
Seventh Circuit's decision in <u>Mullins</u>, and Plaintiff's motion
will therefore be granted.  However, neither <u>Rikos</u> nor <u>Mullins</u>
is not binding on this Court, and the Court continues to apply
Third Circuit precedent in deciding Plaintiff's motion for class
certification.

**B.   Summary Judgment**

Count I of the complaint, which is the only count remaining against the BMW Defendants, alleges that the BMW Defendants violated the TCPA.   The TCPA provides in relevant part as follows:

> It shall be unlawful for any person . . . to use any telephone facsimile machine . . . to send, to a telephone facsimile machine, an unsolicited advertisement, unless . . . the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D).

47 U.S.C. § 227(b)(1)(C)(iii).   "[T]he statute is silent as to who should be classified as a sender of unsolicited fax advertisements.   The statute, thus, fails to identify whether, for purposes of section 227(b)(1)(C), the sender is the advertiser, a fax broadcasting service hired by the advertiser, the common carrier whose network is used to send the fax, or whether multiple individuals or entities are 'senders.'"   Palm Beach Golf Center–Boca, Inc. v. John G. Sarris, D.D.S., P.A., 781 F.3d 1245, 1256 (11th Cir. 2015).   The Federal Communications Commission (hereafter, "FCC"), in turn, has defined "sender" as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement."   47 CFR § 64.1200(f)(10).   The language of the TCPA and the FCC's accompanying definition of "sender" together

25

establish that under the TCPA, direct liability attaches to the entity on whose behalf an unsolicited facsimile is sent or whose goods or services are promoted in such facsimile.

The BMW Defendants move for summary judgment on the ground that they are not the "sender" of the BMW fax, thereby exculpating them from liability under the TCPA.  According to the BMW Defendants, the undisputed evidence demonstrates that Creditsmarts composed the BMW fax and caused such fax to be transmitted to Creditsmarts' customers, without the knowledge or consent of the BMW Defendants.[9]  The BMW Defendants assert that Creditsmarts was not authorized to conduct facsimile marketing on behalf of the BMW Defendants and did not obtain consent from the BMW Defendants to advertise their products or services in the BMW fax.  The BMW Defendants thus contend that they did not use a fax machine to send an unsolicited advertisement as required under the TCPA.  Furthermore, the BMW Defendants argue

---

[9] This, too, is the crux of Creditsmarts' submission joining in the BMW Defendants' motion for summary judgment.  The Court, however, does not consider Creditsmarts' submission because it fails to provide Plaintiffs an opportunity to respond.  While the Court recognizes that Creditsmarts is not moving for summary judgment, it is attempting to inject evidence into the record in support of the BMW Defendants' summary judgment motion without providing Plaintiff a means of responding to such evidence in accordance with Local Civil Rule 56.1.  Furthermore, as noted by Plaintiff, Creditsmarts' brief was filed the same day that Plaintiff's opposition brief was due, thereby depriving Plaintiff of the opportunity to address the evidence cited in Creditsmarts' submission.  Accordingly, Plaintiff's motion to strike the submission will be granted.

that they cannot be held vicariously liable for the acts of Creditsmarts because Creditsmarts was an independent contractor, there was no actual or apparent authority for Creditsmarts' actions, and the BMW Defendants did not ratify the actions by Creditsmarts.

In response, Plaintiff asserts that the BMW Defendants are directly liable for sending the BMW fax.  It is undisputed that Westfax sent the BMW fax at the direction of Creditsmarts, and the BMW Defendants did not actually send the fax or cause the fax to be sent.  It also appears undisputed that the BMW Defendants never specifically requested that the BMW fax be created or sent.  Plaintiff argues that the BMW Defendants are nonetheless liable under the TCPA because the fax was sent "on behalf of" the BMW Defendants and, in any event, advertised the BMW Defendants' goods or services.

As noted above, the FCC regulation defining a "sender" appears to prescribe "two parallel, and often blended, theories of 'sender' liability[.]" City Select Auto Sales, Inc. v. David Randall Associates, Inc., --- F. Supp. 3d ----, 2015 WL 1421539, at *12 (D.N.J. Mar. 27, 2015) (citing 47 C.F.R. § 64.1200(f)(10)).  The first theory of liability "applies to 'the person or entity' on 'whose behalf' a third party transmits an unsolicited facsimile advertisement[.]"  Id.  The other theory of liability "applies to the person or entity 'whose goods or

27

services are advertised or promoted in the unsolicited advertisement.'" Id.

The BMW Defendants argue that despite the language of the FCC regulation, the TCPA cannot impose liability upon an entity solely because its goods or services are promoted in an unsolicited advertisement, particularly when there is no evidence that the entity authorized the creation of the facsimile. In support, the BMW Defendants cite Cin-Q Auto., Inc. v. Buccaneers Ltd. P'ship, No. 8:13-cv-01592, 2014 WL 7224943, at *6 (M.D. Fla. Dec. 17, 2014). As stated in Cin-Q Auto, "[t]o conclude that an individual or entity is per se a 'sender' under the TCPA merely because their 'goods or services' appear as advertised in the faxes at issue . . . would give rise to, what the parties have labeled, sabotage liability." Id. An entity could be subjected to liability if an individual, unbeknownst to the organization and without directive from the organization, began promoting the goods or services of the entity. Id. The court found that "[u]niversal liability for complete inaction was not contemplated by Congress in passing the TCPA and does not appear to have been contemplated by the FCC in crafting and interpreting its regulations." Id. The court thus held that a plaintiff in a TCPA case must prove that the unauthorized faxes were sent on behalf of the defendant, and

an action or inaction that sets the causal chain in motion must, in some way, be attributable to the defendant.  Id.

Even the FCC has indicated that the relevant requirement is that an unauthorized fax was sent "on behalf of" the defendant. Specifically, the FCC has noted: "We take this opportunity to emphasize that under the Commission's interpretation of the facsimile advertising rules, the sender is the person or entity on whose behalf the advertisement is sent.  In most instances, this will be the entity whose product or service is advertised or promoted in the message." In re: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 21 F.C.C.R. at 3808.

While the rationale of Cin-Q Auto is persuasive, the Court at this time need not decide whether the BMW Defendants can be liable for a fax that merely promoted their goods or services, because the Court concludes that there is a sufficient dispute of fact as to whether the BMW fax was sent "on behalf of" the BMW Defendants.  While it is clear that the BMW Defendants did not specifically request or authorize the fax at issue to be created or sent, a reasonable jury could conclude that Creditsmarts was acting "on behalf of" the BMW Defendants based on the course of dealings between the parties.  The written Marketing Agreement between the parties seemingly limits the duties of Creditsmarts to matching qualified customers with

29

up2drive, but there is evidence in the record that Creditsmarts also engaged in marketing efforts on behalf of the BMW Defendants.

Murthy, the general manager of online business for BMW FS who signed the Marketing Agreement, testified that Creditsmarts was primarily hired to conduct advertising for up2drive. He described the relationship with Creditsmarts as a "marketing partnership" which "allows [up2drive's] services to be presented to the customers that CreditSmarts" has. Similarly, Ryan, the president of CreditSmarts, testified that no one other than he "was authorized to speak to BMW of Up2Drive personnel regarding any marketing items[,]" but in so stating Ryan confirmed that Creditsmarts and the BMW Defendants had some form of marketing arrangement. Indeed, the agreement between the parties is even titled a "Marketing Agreement."

Furthermore, Creditsmarts created an e-mail that Ryan sent to certain dealers that promoted up2drive -- stating that up2drive is "looking for your BUSINESS" -- and contained the up2drive logo that had been provided by the BMW Defendants. It also appears that Ryan advised a BMW FS employee, Jake Thomson, of Creditsmarts' e-mail marketing effort, having stated in a September 21, 2012 e-mail that he was "trying to figure out how we can promote the Up2drive product by encouraging the email address to be completed on the apps at a great level."

30

Moreover, once the BMW Defendants learned of the BMW fax, they did not take immediate action to ensure that no further solicitations went out on behalf of the BMW Defendants. When Murthy was provided a copy of the fax and questioned about it on December 10, 2012, he merely responded that the BMW Defendants were working with Creditsmarts, which was "trying to develop a network of independents who have been providing us some good business." He did not at that time discuss the fax with anyone, and could not recall doing any investigation with respect to the fax. In fact, despite learning of the fax on December 10, 2012, it does not appear that the BMW Defendants raised the issue of the fax with Creditsmarts until August 8, 2013. In this regard, Thomson, on behalf of BMW FS, testified that he never told Creditsmarts that it was not authorized to use fax advertisements to promote the up2drive services. It thus appears that the BMW Defendants did not express disapproval of the BMW fax, did not advise Creditsmarts that it was in breach of the written agreements, and took no action to ensure that Creditsmarts did not send any further faxes.[10]

---

[10] In fact, more than 10,000 faxes were sent on December 27, 2012 -- more than two weeks <u>after</u> the BMW Defendants learned about the fax on December 10, 2012. Thus, it is possible that the BMW Defendants could have prevented the additional unauthorized transmission of thousands of faxes had they confronted Creditsmarts about the fax when they learned of it. Instead, they failed to reprimand Creditsmarts for violating the written agreements of the parties and took no steps to ensure

31

Based on the foregoing evidence, a trier of fact could reasonably determine that Creditsmarts was authorized to engage in marketing efforts on behalf of the BMW Defendants.  Although it seems clear that the BMW Defendants did not specifically authorize the creation and mailing of the fax at issue in this case, there is sufficient evidence that Creditsmarts exercised some discretion in deciding how to solicit business on behalf of the BMW Defendants.  The Court recognizes that the terms of the written agreements between the parties required approval by the BMW Defendants to use logos or marks, and representatives of the BMW Defendants profess ignorance as to certain marketing efforts undertaken by Creditsmarts.  Nevertheless, once the BMW Defendants learned of such marketing efforts, there is no evidence that they confronted Creditsmarts or attempted to ensure future compliance with the terms of the written agreements.  Under these circumstances, the Court finds a sufficient question of fact remains as to whether Creditsmarts sent the BMW fax "on behalf of" the BMW Defendants.  The BMW Defendants' motion for summary judgment will therefore be denied.

---

Creditsmarts' future compliance with the terms of such agreements.  A trier of fact could conclude from the BMW Defendants' acquiescence that the BMW Defendants approved of the actions taken by Creditsmarts on their behalf.

**VI.  <u>CONCLUSION</u>**

For the reasons set forth above, Plaintiff's motion for class certification will be denied as Plaintiff fails to demonstrate that the class is ascertainable as required under Third Circuit precedent.  Plaintiff's motions for leave to cite supplemental authority in connection with their class certification motion will be granted.  The BMW Defendants' motion for summary judgment will be denied.  Plaintiff's motion to strike Creditsmarts' submission joining in the BMW Defendants' summary judgment motion will be granted.

An Order consistent with this Opinion will be entered.


                                    <u>    s/ Noel L. Hillman  </u>
                                    NOEL L. HILLMAN, U.S.D.J.

Date: September 29, 2015

At Camden, New Jersey


33